UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA *ex rel.* Marc Silver, et al.,

                    Plaintiffs,

        v.

OMNICARE, INC., et al.,

                    Defendants.

HONORABLE NOEL L. HILLMAN

CIVIL ACTION NO. 11-1326

**OPINION**

**APPEARANCES:**

LISA J. RODRIGUEZ
Schnader Harrison Segal & Lewis LLP
Woodland Falls Corporate Park
220 Lake Drive East
Suite 200
Cherry Hill, NJ 08002-1165

SHAUNA BRIE ITRI
SHERRIE R. SAVETT
DANIEL R. MILLER
Berger & Montague, PC
1622 Locust Street
Philadelphia, PA 19103

JENNIFER VERKAMP
FREDERICK M. MORGAN, JR.
Morgan Verkamp, LLC
700 Walnut Street
Suite 400
Cincinnati, OH 45202

ROSS B. BROOKS
Sanford Heisler, LLP
1350 Avenue of the Americas
31st Floor
New York, NY 10019
        *Attorneys for Plaintiffs and Relator*

1

JUDITH H. GERMANO
Germano Law LLC
460 Bloomfield Avenue
Suite 200
Montclair, NJ 07043

MICHAEL MANTHEI
DAVID M. GLYNN
JEREMY M. STERNBERG
NATHANIEL F. HULME
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
     *Attorneys for Defendant PharMerica Corp.*

**HILLMAN**, United States District Judge:

     This is a False Claims Act ("FCA") suit.  As set forth in the Court's previous opinion mainly denying Defendant PharMerica's Motion to Dismiss, Relator Marc Silver alleges "that defendants engaged in a ['swapping'] scheme that violated the Anti-Kickback Statute by offering nursing homes below market prices for drugs to patients insured by Medicare Part A in exchange for referrals of prescriptions for nursing home patients insured by Medicare Part D or by Medicaid."  *United States ex rel. Silver v. Omnicare, Inc.*, 2014 U.S. Dist. LEXIS 136800 at *1 (D.N.J. Sept. 29, 2014).[1] Silver alleges that PharMerica defrauded the federal government when it submitted Medicare and Medicaid claims for reimbursement

---

[1]  As stated in the previous opinion, this Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. *U.S. ex rel. Silver*, 2014 U.S. Dist. LEXIS 136800 at *4.

which certified PharMerica's compliance with the Anti-Kickback Statute.

At issue is whether the public disclosure bar, or the original source exception to that bar, apply to Silver's suit. Before the Court is PharMerica's jurisdictional motion to dismiss pursuant to Fed. R. Civ. P 12(b)(1), which applies to Silver's claims based on conduct before March 23, 2010; and PharMerica's summary judgment motion, which applies to Silver's claims based on conduct after March 23, 2010.[2]  For the reasons stated herein, the Court holds that, as to all of PharMerica's conduct, the public disclosure bar applies, and the original source exception does not apply.[3]  Accordingly, both motions will be granted.  The Court will

---

[2]  As will be discussed further *infra*, in 2010, Congress made substantive statutory changes to the FCA which materially alter the analysis of the issues presented.  *See U.S. ex rel. Moore & Company, P.A. v. Majestic Blue Fisheries, LLC et al.*, 812 F.3d 294, 297 (3d Cir. 2016)("In 2010, Congress amended the public disclosure bar as part of the Patient Protection and Affordable Care Act ('PPACA').  In doing so, it removed the language that explicitly stated that a court was deprived of 'jurisdiction' over the FCA action if the bar applied to that action . . . and expanded the definition of 'original source' by allowing a relator who 'materially adds' to the publicly disclosed information to qualify.").  These statutory changes account for PharMerica's two different motions addressing the same legal issues.

[3]  The Motion to Dismiss covers conduct *before* March 23, 2010, and the Motion for Summary Judgment covers conduct *after* March 23, 2010.  PPACA's effective date is March 23, 2010; therefore the summary judgment motion (rather than the motion to dismiss) necessarily includes the alleged conduct occurring on March 23, 2010.

3

also decline to exercise supplemental jurisdiction over the remaining state law claims.

## I.    Background

The allegations concerning the alleged fraudulent scheme have been set forth in the Court's previous opinion and are not directly implicated by the instant motions.  The following facts are most relevant to the issues presently before the Court.

Relator Silver has never worked for, nor done business with, PharMerica. (SUF ¶ 5)  However, Silver is generally knowledgeable about the nursing home business, and the pharmacy business, because he is a former owner of both a nursing home and a pharmacy. (SUF ¶ 4)  Thus, Silver knew about the Balanced Budget Act of 1997's effect on the nursing home industry, which set the stage for potential swapping transactions.  Specifically, Silver testified that the law "totally changed the financial picture for nursing homes in the United States," (SUF ¶ 24), because as to Medicare Part A patients, the government switched from a reimbursement system based on actual costs, to a prospective payment per diem fixed cost system. (SUF ¶ 25-26)  According to Silver, this new arrangement provided the "clear motive" for pharmacies and nursing homes to engage in swapping transactions. (Silver Dep. p. 61-62)

**A. HHS-OIG documents indicate that illegal swapping transactions may be occurring in the nursing home business**

As quoted in Silver's Third Amended Complaint, the Health and Human Services - Office of the Inspector General (HHS-OIG), in 1999, stated in an advisory opinion, that suppliers who offer "'discounts on business for which the purchaser pays the supplier, in exchange for the opportunity to service and bill for higher paying Federal health care program business reimbursed directly by the program to the supplier'" violate the Anti-Kickback Statute. (TAC ¶ 61)  Although the Advisory Opinion analyzed swapping transactions between nursing homes (referred to as "skilled nursing facilities" or "SNFs") and an ambulance company (i.e., not nursing homes and pharmacies) the opinion specifically stated that the ambulance company's inquiry

> 'comes amidst a considerable number of informal inquiries and anecdotal reports regarding discounts to SNFs that this Office has received since the enactment of the SNF PPS [(prospective payment system)]. *These inquiries and reports suggest that suppliers of a wide range of SNF services are giving SNFs discounts for PPS-business that are linked, directly or indirectly to referrals of Part B business.*'

(TAC ¶ 62)(emphasis added).

The Third Amended Complaint also quotes a March, 2000, HHS-OIG "Program Guidance for Nursing Facilities," which relied upon the 1999 Advisory Opinion, and explained,

> '[s]wapping occurs when a supplier gives a nursing facility discounts on Medicare Part A items and services in return for the referrals of Medicare Part B business.

> With swapping, there is a risk that suppliers may offer
> a SNF an excessively low price for items or services
> reimbursed under PPS in return for the ability to service
> and bill nursing facility residents with Part B
> coverage.'

(TAC ¶ 64)

The HHS-OIG, in 2008, stated again that "'swapping

arrangements violate the anti-kickback statute'":

> 'nursing facilities should not engage in swapping
> arrangements by accepting a low price from a supplier or
> provider on an item or service covered by the nursing
> facility's Part A per diem payment in exchange for the
> nursing facility referring to the supplier or provider
> other Federal health care program business, such as Part
> B business excluded from consolidated billing, that the
> supplier or provider can bill directly to a Federal
> health care program.'

(TAC ¶ 65)(quoting HHS-OIG Supplemental Compliance Program

Guidance for Nursing Facilities).

**B. A Centers for Medicare and Medicaid Services ("CMS") report indicates that long-term care pharmacies provide prescription drugs to nursing homes at little to no charge**

In December 2004, The Lewin Group prepared a report entitled,

"CMS Review of Current Standards of Practice for Long-Term Care

Pharmacy Services; Long-Term Care Pharmacy Primer." (Def's Ex. F)

The report indicated that, as to long-term care pharmacies

("LTCPs") in particular, conditions were ripe for swapping

transactions:

> [i]n today's environment, LTCPs provide many services to
> nursing facilities at little to no charge.  When LTCPs
> do charge for services, the pricing for services is
> difficult to determine since services are often bundled
> together.  As a result there is a great deal of

6

uncertainty in the market regarding the cost to LTCPs of providing services of the potential charge structure that would exist in the market if LTCPs were reimbursed directly for the services they provide.

. . . .

Medicaid reimbursement rates are important to LTCPs not only because Medicaid accounts for the largest portion of LTCP revenue, but also because Medicaid rates are often used to set a pricing 'floor' in the industry, effectively setting the lowest price in the market and thereby guaranteeing minimum reimbursement rates to LTCPs. This practice arises for two reasons. First, LTCPs are concerned that offering nursing facilities rates lower than Medicaid's for non-Medicaid residents could be viewed as an 'inducement' to attract Medicaid business and would be in violation of Fraud and Abuse statutes. Second, some Medicaid programs include a 'most favored nation' status clause in their contracts that require LTCPs to grant Medicaid the best price in the market; effectively, if a LTCP contracts with a nursing facility for a reimbursement rate below that of Medicaid, it must extend that same price to the Medicaid program.

(Ex. F, p. 1, 19-20)

**C. Two sources report that PharMerica is one of only several LTCPs in the "highly concentrated LTCP market"**

In June 2007, a Harvard Medical School report, created for the Medicare Payment Advisory Commission, stated that "[t]he LTCP market is highly concentrated. Three companies, Omnicare, PharMerica, and Kindred Pharmacy Services (KPS), account for around 60% of the sector's revenues." (Def's Ex. G) The report further stated that PharMerica was second only to Omnicare in terms of number of "nursing home beds" serviced in the United States. (Id.)

7

The Medicare Payment Advisory Commission, in turn, reported to Congress that "[t]he LTCP market is highly concentrated, with the top three firms accounting for two-thirds of nursing home beds: Omnicare covers about 850,000 of the nation's 1.7 million beds (50 percent), PharMerica covers 220,000 (13 percent), and Kindred Pharmacy Services (KPS) covers 100,000 (6 percent)." (Def's Ex. H)

### D. PharMerica's public financial statements show that PharMerica was making a profit

Silver examined PharMerica's Form 10-Ks, available on the Internet. (SUF ¶ 10)  He testified that he used the information reported -- in particular, PharMerica's costs, gross profits, and its "'bottom line'"-- and, based on that information, inferred that PharMerica must be selling prescription drugs to nursing homes at "below cost per diems," (Silver Dep. p. 72-73), and that "PharMerica, they were getting substantially less from their . . . Medicare reimbursements than they were from their Medicaid reimbursements." (Id. p. 203)  According to Silver, PharMerica's reported profit figures indicated to him that PharMerica must have engaged in swapping transactions with the nursing homes it serviced. (Id.)

### E. Other non-public sources "confirm" what Silver already inferred

Silver met and spoke with Andrew Lenick, a consultant for certain nursing homes that contracted with PharMerica. (SUF ¶ 47)

Lenick generally explained that the competition between Omnicare and PharMerica was intense and each were "lowering prices" to gain nursing home business. (Silver Dep. p. 85-86)  Silver testified, "[Lenick] just confirmed everything that I . . . either was able to confirm myself or my suspicions." (Id. p. 83-84) Significantly, Lenick did not tell Silver that PharMerica was offering below cost per diem pricing; to the contrary, Lenick stated that he negotiated 'fair market prices' with PharMerica. (SUF ¶ 50-52)

Silver also "ma[de] random phone calls to" nursing homes during which conversations he "learned that the whole industry was using some form of discount pricing," (Silver Dep. p. 55), but no one told him that PharMerica or any other institutional pharmacy was offering discounts below cost. (SUF ¶ 42)  Silver testified these phone calls "confirmed" his suspicions that PharMerica was offering below cost per diem pricing. (Silver Dep. p. 56, 83-84)

## II. Legal Standards

### A.  Rule 12(b)(1) motion to dismiss standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the existence of a federal court's subject matter jurisdiction.  Facial attacks contest the sufficiency of the pleadings, and in reviewing such attacks, the Court accepts the allegations as true. *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir.), *cert. denied*, 558 U.S.

9

1091, 130 S. Ct. 1015, 175 L. Ed. 2d 618 (2009).  Factual attacks, on the other hand, require the Court to weigh the evidence at its discretion, meaning that the allegations in the complaint have no presumptive truthfulness.  *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

It is undisputed that PharMerica's 12(b)(1) motion asserts a factual attack.

**B.  Summary judgment standard**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)(citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to

be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004)(citing *Anderson*, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); *see also Singletary v. Pa. Dept. of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.")(citing *Celotex*, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.  A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s.]'" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).  For "the non-

moving party[ ] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Cooper v. Sniezek*, 418 F. App'x 56, 58 (3d Cir. 2011)(citing *Celotex*, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 257.

### III. Analysis

**A. FCA claim based on conduct before March 23, 2010**

**1. The public disclosure bar**

"The FCA's public disclosure bar 'deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels.'" *United States ex rel. Judd v. Quest Diagnostics Inc.*, 638 F. App'x 162, 165 (3d Cir. 2015)(quoting *Graham Cnty Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 285 (2010)). The public disclosure bar applies if there was a public disclosure via a source enumerated in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A); the information disclosed "constituted allegations or transactions of fraud"; and "the relator's complaint is based upon those public disclosures." *United States*

12

*ex rel. Zizic v. Q2Administrators, LLC et al.,* 728 F.3d 228, 235-37 (3d Cir. 2013)(internal citation and quotation omitted).

PharMerica contests only the second and third prongs of the analysis.[4]

### a. "Transactions of fraud"

"A transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts." *Zizic*, 728 F.3d at 236.  The Third Circuit has "adopted a formula to represent when information publicly disclosed in a specified source qualifies as [a] . . . transaction of fraud: If X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." *Id.*  "[T]he public disclosure bar applies if either Z (fraud)[,] or both X (misrepresented facts) and Y (true facts)[,] are publicly disclosed by way of a listed source." *Id.*

The parties agree that in this case, the alleged misrepresented state of facts (X) is that PharMerica was in compliance with the Anti-Kickback Statute.  The alleged true state

---

[4]  Relevant to the instant suit, the enumerated sources include "congressional, administrative, or Government Accounting Office report[s], hearing[s], audit[s], or investigation[s]," as well as "news media" reports. 31 U.S.C. § 3730(e)(4)(A)(2005).

of facts (Y) is that PharMerica had engaged in swapping transactions with nursing homes which violated the Anti-Kickback Statute.

Silver argues Y, the true state of facts, was not disclosed by the enumerated sources upon which he relied.  He argues that to reveal the alleged true state of facts, PharMerica's publicly filed financial statements "would need to break out, on a nursing home by nursing home basis, the net income it received from the nursing home for drugs only for its Medicare Part A patients and the net income it received for drugs from servicing that same nursing home's Medicare Part D and Medicaid patients." (Opposition Brief, p. 15-16)

Elaborating on this reasoning at oral argument, Silver's counsel explained that the publicly disclosed information did not reveal "the revenue side" of PharMerica's alleged swapping transactions.  Counsel argued that Silver provides the revenue side of the equation in the form of a small number of contracts that PharMerica negotiated with specific nursing homes that stated particular per diem prices.

This argument fails for two reasons.  First, Silver cannot explain how the specific per diem prices he obtained support any conclusion regarding PharMerica's net income for Medicare Part A patients on one hand, and Medicare Part D and Medicaid patients on the other.  In this respect, his own argument is internally

14

inconsistent: he asserts that to disclose the fraudulent transaction, the public documents would have to disclose PharMerica's net income, yet even the non-public documents Silver obtained do not contain such information.

Second, Silver clearly testified at his deposition that he did not need to know such specifics to conclude that PharMerica had engaged in illegal swapping; the aggregate numbers were sufficient. (Silver Dep. p. 376-77)  Silver testified that the cost of dispensing medications, reported in PharMerica's 10K, was an indication that PharMerica had engaged in swapping: "I mean, come on, $10 a day for medication for the sickest and frailest of the elderly on Medicare?  You know, it is not-- these are the sick patients, and PharMerica is selling their medications at $8 a day? $10 a day? Come on."  (Id. p. 72-73); *see also* (id. p. 203)("the profit PharMerica was making certainly couldn't be – they couldn't be making anything from Medicare based on $8 a day, $10 a day . . . . So you don't have to be Price Waterhouse to understand that. You could make that analysis pretty easy."), (id. p. 273-74)("there's a lot of data out there on the Internet . . . on transition to . . . PPS as to what the costs are.  And when you read them, it doesn't seem possible that PharMerica when they add in all their costs could be making a profit."); *cf.* Third Amended Complaint ¶ 153 ("Relator owned an institutional pharmacy . . . . In 2006, his acquisition costs averaged $29.41 per patient per

day, and his operational costs averaged $10.88 per patient, per day.  Thus, *just to break even*, he needed to get paid $40.29 per patient, per day.  Thus viewed, it is virtually certain that PharMerica offered prices to nursing homes which fell below its own acquisition costs, and even further below its own total costs.  The reason is simple-- PharMerica recaptured those losses, and handsomely profited, by billing Medicaid and Medicare Part D at substantially higher prices.")(emphasis in original), Third Amended Complaint ¶ 180 ("Given the amount of drugs being taken by each [nursing home] patient, and the rising cost of drugs overall, how can a pharmacy make money by providing drugs to nursing home patients for $14/day?  The answer is, it can't.").

The Court concludes that the information cumulatively disclosed in the publicly available documents was sufficient to support an inference that PharMerica allegedly engaged in swapping transactions with nursing homes, and therefore the true state of facts (Y) was publicly disclosed.

As set forth above, the HHS-OIG documents stated that swapping transactions may be taking place between nursing homes and their various service providers.  Then, the CMS report stated that conditions were ripe for swapping transactions specifically between nursing homes and long-term care pharmacies.  As to long-term care pharmacies, it was publicly reported that the market was highly concentrated, with PharMerica being one of the top three

pharmacies accounting for two-thirds of all nursing home beds in
the United States.  Thus, all of this information taken together
strongly suggested that PharMerica, being one of three top long-
term care pharmacies contracting with nursing homes, was likely
engaging in illegal swapping.

According to Silver himself, the last piece of information he
needed to conclude that PharMerica was, indeed, engaging in
swapping was provided by PharMerica's own publicly disclosed
financial statements.

This information, considered cumulatively, was sufficient to
"put the government on the trail" of the fraud, *United States ex
rel. Schumann v. Astrazeneca Pharms. LP*, 2013 U.S. Dist. LEXIS
10582 at *26 (E.D. Pa. Jan. 25, 2013), *aff'd by United States ex
rel. Schumann v. AstraZeneca Pharms. L.P.,* 769 F.3d 837 (3d Cir.
2014), therefore the public disclosure bar applies. *See United
States ex rel. Doe v. Staples, Inc.,* 773 F.3d 83, 87 (D.C. Cir.
2014)("our inquiry focuses not on the additional incriminating
information a relator supplies, but instead on whether the quantum
of information already in the public sphere was sufficient to set
government investigators on the trail of fraud.")(internal
citation and quotation omitted); *Natural Gas Royalties Qui Tam
Litig. v. Pac. Gas & Elec. Co.*, 562 F.3d 1032, 1043 (10th Cir.
2009)("We therefore conclude that the allegations of industrywide
gas mismeasurement disclosed in the 1995 complaint and the Senate

Committee documents were sufficient to set the government on the trail of the fraud as to all Defendants and thus that the allegations in Relator's 1997 complaints were publicly disclosed."); *Dingle v. Bioport Corp.*, 388 F.3d 209, 214 (6th Cir. 2004)("The fact that the information comes from different disclosures is irrelevant.  All that is required is that public disclosures put the government on notice to the possibility of fraud.  These two sources, in combination, certainly achieve that requirement.").

**b. "Based upon" the public disclosures**

"To be based on . . . transactions of fraud, claims need not be actually derived from public disclosures.  Rather, claims need only be supported by or substantially similar to public disclosures." *Zizic*, 728 F.3d at 237 (internal citations and quotations omitted).  "The public disclosure bar covers . . . actions even partly based upon such . . . transactions." *Id.* at 238.

Silver makes two arguments in support of his position that his allegations are not "based upon" the publicly disclosed transactions of fraud.

First, he argues that the transactions were not publicly disclosed. (Opposition Brief, p. 24)  As set forth above, the Court disagrees.

18

Second, Silver states, "PharMerica completely ignores non-public information relator relied upon." (Opposition Brief, p. 26) That Silver relied upon non-public disclosures *in addition to* the substantial public disclosures, however, is irrelevant to this portion of the legal analysis because the Third Circuit has clearly stated that the public disclosure bar applies to "actions even partly based upon" public disclosures. *Zizic*, 728 F.3d at 238.

Silver's Third Amended Complaint extensively relies upon, and quotes, the HHS-OIG documents. (Third Amended Complaint ¶¶ 156-163)  Therefore Silver's allegations are "supported by," *Zizic*, 728 F.3d at 237, and based upon, those public disclosures.

The Court thus concludes that the public disclosure bar applies to Silver's FCA claim based on conduct before March 23, 2010.  Accordingly, the Court must next consider whether the original source exception applies.

## 2. The original source exception

"Even if the public disclosure bar would otherwise apply to a claim, it does not when 'the person bringing the action is an original source of the information.'  The term 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . which is based on the information." *Zizic*,

728 F.3d at 239 (quoting the pre-PPACA version of the FCA); *see also Schumann,* 769 F.3d at 841 ("Congress defined an 'original source' as 'an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.'")(quoting the pre-PPACA version of the FCA).

### a. "Direct" knowledge

"Direct knowledge is knowledge obtained without any intervening agency, instrumentality, or influence: immediate. Such knowledge has also been described as first-hand, seen with the relator's own eyes, unmediated by anything but the relator's own labor, and by the relator's own efforts, and not by the labors of others, and not derivative of the information of others." *Schumann*, 769 F.3d at 845 (internal citations and quotations omitted).

Silver points to no evidence that would support a conclusion that he had immediate knowledge of any of the specific factual allegations which his FCA claim relies upon.  It is undisputed that Silver never worked for, nor did business with, PharMerica. (SUF ¶ 5)  All of Silver's alleged facts are derivative of the information he gathered from other, mostly public, sources.  While his own experience as a CPA, nursing home owner and pharmacy owner gave him the knowledge to understand the significance of the

20

facts, it still remains undisputed that the facts themselves did not come from Silver, they came from enumerated sources, Mr. Lenick, and nursing homes.  The undisputed record shows that Silver had no first-hand information about PharMerica's transactions with nursing homes.

### b. "Independent knowledge"

"The independent knowledge requirement means that knowledge of the fraud cannot be merely dependent on a public disclosure." *Schumann*, 769 F.3d at 845 (internal citation and quotation omitted); *see also Zizic*, 728 F.3d at 240 ("A relator's knowledge is independent if it does not depend on public disclosures."). "'[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation.  If the latter were enough to qualify the relator as an original source, then a cryptographer who translated a ciphered document in a public court record would be an original source, an unlikely interpretation of the phrase.'" *Schumann*, 769 F.3d at 845 (quoting *U.S. ex rel. Stinson, Lyons, Gerlin, & Bustamonte, P.A. v. The Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991)); *see also Zizic*, 728 F.3d at 240 ("we have repeatedly rejected the argument that a relator's knowledge is independent when it is gained through the application

of expertise to information publicly disclosed under §
3730(e)(4)(A).").

In opposition to PharMerica's argument that Silver's
knowledge is not independent, Silver argues that "the *Complaint*
contains allegations related to the per diem revenue PharMerica
obtained from nursing homes for their Medicare Part A patients,"
and "[t]he *Complaint* also describes the costs of providing drugs
to nursing homes for Part A patients." (Opposition Brief, p.
29)(emphasis added).  This argument fails.

The independent knowledge inquiry focuses not on the
allegations of the complaint, but rather the source of a relator's
knowledge.  That the complaint alleges certain facts does not tell
the Court where those facts came from.  Silver's brief leaves the
critical question-- *how* does Silver know what he alleges?--
unanswered.  Particularly when the ultimate inquiry is
jurisdictional in nature (i.e., Silver bears the burden of
establishing jurisdiction), this deficiency matters.

Moreover, as already discussed, Silver's argument that he
independently supplied the specific dollar figures for
PharMerica's per diem cost of providing certain drugs is directly
contradicted by Silver's own deposition testimony.  Silver
testified that he did not know what PharMerica's individual costs
and prices were (Silver Dep. p. 59-60, 67, 86, 138, 155, 202-05,
209, 379, 393-94), and further, that he did not *need* to know such

22

information to determine that PharMerica was allegedly engaging in
swapping transactions. (Silver Dep. p. 376-77)  The uncontradicted
fact that Silver himself did not need such information precludes
the Court from holding that such information was "substantive."
*Schumann*, 769 F.3d at 845.

Based on the record before the Court, Silver appears to be
the paradigmatic "cryptographer." *Schumann*, 769 F.3d at 845.
Silver "appli[ed] [his] expertise," *Zizic*, 728 F.3d at 240, as a
CPA, pharmacy owner, and nursing home owner to determine the
significance of the publicly disclosed facts.  He clearly stated
so in his deposition:

> I can only rely upon what's out there on the basis of
> disclosure, public disclosure, but I also have the
> ability to look at my expertise running an institutional
> pharmacy, running a nursing home and then take that and
> say, hey, I suspect there's a problem.  What do you
> think, attorneys?  And then let the attorneys advise me.

(Silver Dep. p. 394-95); *see also* (id. at p. 58-59)("I'm a CPA, I
ran an institutional pharmacy, I operated a health care complex
for many years. . . . I have the expertise to ascertain and report
what I believe the [per diem prices] would be."), (id. at p.
351)("owning a pharmacy, running a pharmacy, having decades in –
as a nursing home manager and provider of services would certainly
make me suspicious that $11 a day could easily be construed as
commercially unreasonable based on my knowledge of medication
costs and based on my knowledge of what it would cost to operate

23

an institutional pharmacy which I did.  And which I was able to compare my costs with looking at the $11 per diem.").

The record evidence, as a matter of law, fails to support the conclusion that Silver is an original source.  Accordingly, this Court lacks jurisdiction over Silver's FCA claim based on conduct before March 23, 2010, and PharMerica's Rule 12(b)(1) motion will be granted.

## B. FCA claim based on conduct on and after March 23, 2010

### 1. The public disclosure bar

While the PPACA altered the public disclosure bar analysis regarding enumerated sources, *Majestic Blue Fisheries*, 812 F.3d at 297, the change does not affect the legal analysis in this case because Silver does not rely on any pre-PPACA enumerated sources. Thus, the Court relies on the analysis set forth above at III., A., 1., and holds that the public disclosure bar applies to Silver's FCA claim based on conduct after March 23, 2010.

### 2. The original source exception

The original source exception, as amended by the PPACA, provides, "'original source' means an individual . . . (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). As the Third Circuit has explained, after the PPACA, "[t]he focus

24

now is on what independent knowledge the relator has added to what was publicly disclosed." *Majestic Blue Fisheries*, 812 F.3d at 300.

### a. "Independent of" the publicly disclosed transactions

To determine whether Silver's knowledge is independent under the post-PPACA FCA, the Court must "compare [Silver's] knowledge with the information that was disclosed through the public disclosure sources enumerated in § 3730(e)(4)(A)." *Majestic Blue Fisheries*, 812 F.3d at 305.

Here, Silver's knowledge is essentially coterminous with the information in the enumerated sources.  Silver himself was clear that the non-public information he obtained from Mr. Lenick and his calls to nursing homes only "confirmed" what he already knew, inferred or suspected.

Silver has not raised a triable issue of material fact as to whether his knowledge was independent; the Court holds as a matter of law that Silver's knowledge was not independent, rather it was almost entirely dependent on the public disclosures in the enumerated sources.

### b. "Materially adds to" the publicly disclosed transactions

"[A] relator materially adds to the publicly disclosed . . . transaction of fraud when [he] contributes information-- distinct from what was publicly disclosed-- that adds in a significant way to the essential factual background: the who, what, when, where

and how of the events at issue." *Majestic Blue Fisheries*, 812 F.3d at 307.

The record is clear that Silver added no significant information or details concerning the essential facts of PharMerica's alleged swapping transactions.  The who -- nursing homes and long-term care pharmacies (specifically PharMerica, Omnicare, and KPS)-- were identified in the HHS-OIG documents, the CMS report, and the Medicare Payment Advisory Commission's report to Congress.  The mechanics of the swapping transactions, and why they were illegal-- i.e., the what, where, and how-- were also disclosed in the HHS-OIG documents.  Lastly, the "when" could also be determined from the 1997 change in the Medicare law in conjunction with PharMerica's financial documents and the HHS-OIG documents.

Here, again, Silver's reliance on a handful of non-public contracts containing specific per diem prices is a red herring. Those specific prices are insufficient to support any conclusion as to PharMerica's revenue streams, and whether such contracts were profitable.  Therefore, the contract price details, as a matter of law, do not materially add to the public disclosures.

Silver points to no record evidence raising a triable issue of fact as to whether he contributed non-public information that materially added to PharMerica's alleged illegal swapping scheme.

Accordingly, PharMerica's Motion for Summary Judgment will be granted.

**C. Supplemental state law claims**

The Third Circuit has repeatedly stated, "'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)(citing 28 U.S.C. § 1367(c)(3), and quoting *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir. 1995))(emphasis added); *cf. Sarpolis v. Tereshko*, 625 F. App'x 594, 600 (3d Cir. 2016)(affirming district court's retention and exercise of supplemental jurisdiction under § 1367(c)(3) because the district court had "an affirmative justification for exercising supplemental jurisdiction.")(quoting *Hedges*).

Here, PharMerica has specifically asked the Court to decline supplemental jurisdiction over the many claims Silver asserts pursuant to 28 individual states' false claims statutes.  In opposition, Silver asserts that "forcing the parties to litigate in 28 different forums would decrease judicial economy and efficiency" and "substantially increase legal fees and court costs." (Opposition to 12(b)(1) Motion, p. 32).

The Court questions whether dismissal without prejudice of the supplemental state law claims will necessarily result in 28 individual suits in 28 different fora.  Moreover, even if this is the result, as PharMerica observes, judicial economy may be enhanced insofar as it would give each local forum the opportunity to apply its own statutory law.

Conversely, retention of supplemental jurisdiction will necessarily require this Court to apply 28 individual state statutes in a single suit-- an unwieldy task.

Thus, the Court finds no sufficient affirmative justification for retaining supplemental jurisdiction of the remaining state law claims.  Those claims will be dismissed without prejudice to Silver's right to refile in the appropriate state forum (or fora).

### IV. Conclusion

For the reasons set forth above, PharMerica's Motion to Dismiss and Motion for Summary Judgment will be granted in their entirety, and the Court will decline to retain supplemental jurisdiction over the remaining state law claims.  An appropriate Order accompanies this Opinion.

Dated: November 28, 2016
At Camden, New Jersey                    ___s/ Noel L. Hillman____
                                         **Noel L. Hillman, U.S.D.J.**

28