### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

UNITED STATES OF AMERICA, ex
rel. MARC SILVER, et al.,

          Relators,

   v.

OMNICARE, INC., et al.,

         Defendants.

1:11-cv-01326-NLH-AMD

OPINION

---

Appearances:

RUSSELL D. PAUL
WILLIAM H ELLERBE
BERGER MONTAGUE PC
1818 MARKET STREET
SUITE 3600
PHILADELPHIA, PA. 19102

LISA J. RODRIGUEZ
SCHNADER HARRISON SEGAL & LEWIS LLP
WOODLAND FALLS CORPORATE PARK
220 LAKE DRIVE EAST, SUITE 200
CHERRY HILL, N.J. 08002-1165

DANIEL WILLIAM MEYLER
U.S. ATTORNEY'S OFFICE
DISTRICT OF NEW JERSEY
970 BROAD STREET, SUITE 700
NEWARK, N.J. 07102

    *On behalf of Relators*

JUDITH H. GERMANO
GWEN M. SCHOENFELD
GERMANO LAW LLC
460 BLOOMFIELD AVENUE, SUITE 200
MONTCLAIR, N.J. 07042

    *On behalf of Defendant PharMerica Corporation*

**HILLMAN**, District Judge

Pending before the Court are Relator Marc Silver's ("Relator") motions to exclude the expert opinions of Louis F. Rossiter, Ph.D., (ECF 636), and Eric Hines, (ECF 639); Defendant PharMerica Corporation's ("PharMerica") motions to exclude the expert opinions of Kenneth W. Schafermeyer, Ph.D., (ECF 641), Allison K. Hoffman, (ECF 642), and Israel Shaked, Ph.D., (ECF 656); and the parties' joint motion to seal, (ECF 675). For the reasons expressed below, Relator's motions will be denied, PharMerica's motions will be granted in part, and the parties' joint motion to seal will be granted in part.

## I.    Background

The facts and procedural history of this case have been recited in prior opinions of the Court and will not be reviewed in detail here. Sufficient for purposes of the pending motions, Relator filed a qui tam action against multiple defendants on behalf of the United States in March 2011, alleging violations of the False Claims Act ("FCA"). (ECF 131 at 2-3). Relator amended the complaint a fourth time as recently as April 2021. (ECF 548).

As Relator succinctly summarized in his briefing for the pending motions, Skilled Nursing Facilities ("SNFs") contract with providers such as PharMerica to supply prescription drugs

for patients, including those covered by Medicare Parts A and D and Medicaid. (ECF 640 at 1). Relator alleges that, from 2005 to 2014, PharMerica offered below-cost and commercially unreasonable pricing for the Part A patients of 174[1] SNFs in exchange for the right to service the facilities' higher volume of patients insured by more profitable Part D and Medicaid programs. (Id. at 1-2). Relator alleges that this "swapping" scheme violated the Anti-Kickback Statute ("AKS") and FCA. (Id.)

On April 14, 2022, the Court granted PharMerica's motion to bifurcate the parties' Daubert and summary judgment motions. (ECF 627). The parties thereafter filed motions, (ECF 636; ECF 639; ECF 641; ECF 642; ECF 644; ECF 656), and related oppositions and replies to exclude one another's expert opinions and testimony. The relevant substance of these expert opinions will be discussed below.

**II. Discussion**

**A. Subject Matter Jurisdiction**

The Court possesses original jurisdiction over Relator's claims stemming from the FCA and AKS. See 28 U.S.C. § 1331. It has supplemental jurisdiction over Relator's state-law claims.

---

[1] The parties' briefing refers to both 174 and 175 SNFs being at issue in this case. PharMerica attributes this inconsistency to a mistaken misclassification in Shaked's report. (ECF 656-1 at ¶ 3 n.3).

See 28 U.S.C. § 1367(a).

**B. The FCA and AKS**

An individual who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval or knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim is liable to the United States under the FCA.  See 31 U.S.C. § 3729(a)(1)(A)-(B).  The FCA is intended "to reach all types of fraud . . . that might result in financial loss to the Government."  United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481, 486 (3d Cir. 2017) (omission in original) (quoting Cook Cnty. v. United States ex rel. Chandler, 538 U.S. 119, 129 (2003)).  "A claim is legally false when it does not comply 'with a statute or regulation the compliance with which is a condition for Government payment.'"  Id. (quoting United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305 (3d Cir. 2011)).

This Court has acknowledged that compliance with the AKS is a precondition of payment for Medicare and Medicaid claims.  See United States ex rel. Silver v. Omnicare, Inc., No. 11-1326, 2021 WL 9848445, at *8 (D.N.J. Apr. 13, 2021) (collecting cases).  The AKS establishes criminal penalties for the knowing or willful direct or indirect offer or payment of remuneration to induce referral for the furnishing or arrangement of

4

furnishing of an item or service that may be paid in whole or in part under a federal healthcare program or the purchase, lease, order, or recommendation thereof of a good, facility, service, or item which may be paid in whole or in part under a federal healthcare program.  42 U.S.C. § 1320a-7b(b)(2); see also 42 U.S.C. § 1320a-7a(a)(7) (establishing civil penalties relating to the violation of § 1320a-7b(b)).

### C. Expert Opinion

"Federal Rule of Evidence 702 imposes an obligation upon a district court to ensure that expert testimony is relevant and reliable."  In re Johnson & Johnson Derivative Litig., 900 F. Supp. 2d 467, 493 (D.N.J. Oct. 26, 2012) (citing ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 291–92 (3d Cir. 2012)).  Pursuant to the Rule, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" if their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; their testimony is based on sufficient facts or data and reliable principles and methods; and the expert has reliably applied those principles and methods to the facts of the case.  Fed. R. Evid. 702.  District courts exercise considerable discretion in admitting or excluding expert opinion and testimony.  See Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (noting that district courts'

decisions to admit or exclude expert testimony are reviewed for abuse of discretion).

The Third Circuit Court of Appeals has imposed a "trilogy of restrictions on expert testimony: qualification, reliability and fit." Langbord v. U.S. Dep't of Treasury, 832 F.3d 170, 194 (3d Cir. 2016) (quoting Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)). Qualification requires that the witness possess specialized knowledge, skills, training, or expertise. Krys v. Aaron, 112 F. Supp. 3d 181, 189 (D.N.J. June 12, 2015) (citing Schneider, 320 F.3d at 404). Reliability demands "that the testimony be based upon 'the "methods and procedures of science" rather than on "subjective belief or unsupported speculation"' and that the expert have '"good grounds" for his or her belief.'" Id. (quoting Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003)). Finally, fit is a "'helpfulness' standard" that refers to the testimony's relevance and ability to assist the factfinder. Id. at 190 (citing Schneider, 320 F.3d at 404). The proponent of the expert testimony bears the burden of establishing each requirement by a preponderance of the evidence. Ford v. Ford Motor Co., 311 F. Supp. 3d 667, 673 (D.N.J. Oct. 27, 2017).

An expert's opinion may be based on facts or data that the expert personally observed or was made aware of, and such facts

6

and data need not be admissible in order to be relied upon, though otherwise inadmissible facts or data may not be disclosed to the jury unless their probative value substantially outweighs their prejudicial effect.  Fed. R. Evid. 703.  Further, an expert opinion is not objectionable merely "because it embraces an ultimate issue," Fed. R. Evid. 704, particularly if a proper foundation and explanation has been set and the factfinder may otherwise "be left hanging if the witness cannot cap off the testimony with a conclusion about the ultimate issue to which the expert is testifying," Krys, 112 F. Supp. 3d at 192 (quoting 3 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 704.02[1] (9th ed. 2006)).  Courts have, however, struck expert opinions when they have impermissibly concluded whether a legal standard has been met.  See City of Millville v. Rock, 683 F. Supp. 2d 319, 329 (D.N.J. Jan. 12, 2010) (collecting cases).

Expert opinions, despite specialized rules and standards, are still evaluated by the same relevance and prejudice standards as other evidence.  "[O]ne of the fundamental requirements of expert testimony is 'relevance,' which should be evaluated under the standard expressed in" Federal Rule of Evidence 401, Argush v. LPL Fin., LLC, Nos. 13-7821, 14-955, 14-956, 2017 WL 349378, at *2 (D.N.J. Jan. 23, 2017) (citing United States v. Ford, 481 F.3d 215, 218 (3d Cir. 2007)), which itself

states that evidence is relevant if it has any tendency to make a fact of consequence more or less probable, Fed. R. Evid. 401. Similarly, district courts must ensure that expert testimony satisfies the standard of Federal Rule of Evidence 403, see United States v. Williams, 974 F.3d 320, 358 (3d Cir. 2020), which permits the exclusion of relevant evidence if its probative value is substantially outweighed by the risk of unfair prejudice, confusing issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence, Fed. R. Evid. 403.

### III. Analysis

#### A. Relator's Motion to Exclude the Opinions of Rossiter (ECF 636)

Relator challenges two opinions offered by Rossiter. First, Relator seeks to exclude Rossiter's opinion regarding fair market value within the long-term care ("LTC") industry. (ECF 637 at 6-16). Second, Relator asserts that Rossiter's opinion concerning the impact, or lack thereof, of Part A pricing on Part D is contrary to law and therefore unreliable. (Id. at 16-31). The Court rejects both challenges.

In Opinion 1 of his report, and preceding summary thereof, Rossiter discusses the highly competitive nature of the LTC market, the high number of participants and low barrier to entry, the sophistication of participants, and the inability of

pharmacies, like PharMerica, to unilaterally set rates.  (ECF 637-1 at ¶¶ 14, 36, 38).  Rossiter opines that Part A per diem rates represent the natural and expected outcome of that competition among willing buyers and sellers – and therefore fair market value – and further that PharMerica's policies, practices, and actions were consistent with that of a profit-maximizing entity and that "given the nature of the regulatory and competitive environment for LTC Pharmacies, low profit margins for their Medicare Part A contracts are not only unsurprising but expected."  (Id. at ¶¶ 36-37).

Relator contends that Rossiter's opinions run counter to reports, administrative guidance, and other evidence that the LTC market was "permeated" by illegal swapping and thus prices set in such a market cannot represent fair market value.  In support of this proposition, Relator heavily relies on PharMerica's own appellate brief, which recognized administrative and media reports of swapping within the nursing home industry, a report by the Lewin Group discussing LTC pharmacies' ability to provide extensive services at little to no charge while maintaining positive margins, and the prominence in the market of PharMerica and its competitor, Omnicare, Inc. ("Omnicare").  (ECF 637 at 7-9; see also Br. of Appellee, United States ex rel. Silver v. PharMerica Corp., No. 16-4418, 2017 WL 3448226, at *23-27 (C.A.3)).

9

Relator also points to a February 2010 letter from
PharMerica to the Office of the Inspector General ("OIG")
seeking an advisory opinion while acknowledging that its
"competitors, in order to gain SNF customers in certain markets,
increasingly [we]re offering below cost, per diem pricing for
pharmaceutical products and pharmacy services provided to the
SNF's Part A residents," PharMerica had to match or beat
competitors' Part A pricing to remain competitive, and it had
been reluctant to do so given such practices' potential
implication of the AKS.  (ECF 637 at 10-11; ECF 637-4 at 5).  An
advisory opinion was not issued due to an investigation or
proceeding involving the same or substantially the same actions.
(ECF 637-5).  Finally, Relator cites Omnicare's $124-million
settlement relating to conduct that overlapped in time with the
allegations here, (ECF 637 at 12-13; see also Press Release,
Dep't of Just., Nation's Largest Nursing Home Pharmacy Company
to Pay $124 Million to Settle Allegations Involving False
Billings to Federal Health Care Programs (June 25, 2014)
(available at https://www.justice.gov/opa/pr/nation-s-largest-
nursing-home-pharmacy-company-pay-124-million-settle-
allegations-involving)), deposition testimony from PharMerica's
Donovan Bentley stating that Part A pricing at or below costs
was common, (ECF 637 at 11-12; see also Bentley Dep. Tr. at
25:18 to 26:5), and Rossiter's testimony indicating that he was

unfamiliar with – or did not consider – some of the above documents and acknowledgement that per diem pricing in an illegal market would produce an illegal fair market value, (ECF 637 at 15; see also Rossiter Dep. Tr. at 56:16 to 57:19, 63:5-24).

First, the Court notes that Relator's brief relies on United States ex. rel. Gale v. Omnicare, Inc., No. 1:10-cv-127, 2013 WL 3822152 (N.D. Ohio July 23, 2013), for the proposition that "the standard for illegal remuneration cannot be based upon a comparison to competitors' prices because 'if the industry were permeated with these swapping practices, then all companies might be engaging in kickbacks.'" (ECF 637 at 13 (quoting Gale, 2013 WL 3822152, at *6 n.66)). This characterization of Gale paints an incomplete picture in the Court's eyes. The cited footnote discusses the relative shortcomings of Omnicare's position that the baseline for determining whether price reductions were offered should have been fair market value while the relator preferred using Omnicare's usual and customary rate. See Gale, 2013 WL 3822152, at *6, 6 n.66. The court noted that, under Omnicare's proposed standard, absurd results could ensue if the industry were permeated by illegal swapping – including anything short of servicing Part A patients for free in exchange for referrals. Id. at *6 n.66. The Court does not read this hypothetical flaw as a rejection of fair market value or

acknowledgment of actual permeation of illegal swapping within the market. Persuasively, despite this identified flaw, the Gale court concluded that "Omnicare's [standard] more closely approximates the statute's intent" and that "Omnicare's Usual and Customary price would be evidence of the fair market value, but so would the prices charged by Omnicare's competitors." Id. at 6; see also U.S. ex rel. Jamison v. McKesson Corp., 900 F. Supp. 2d 683, 699 (N.D. Miss. Sept. 28, 2012) ("In the context of the AKS, courts use 'fair market value' as the gauge of value when assessing the remuneration element of the offense.").

More directly, the Court is not satisfied that Relator has established with the sources cited that the LTC market was permeated with illegal swapping to the extent that Rossiter's opinions as to fair market value must be excluded. Relator certainly demonstrates that illegal swapping has occurred and, to the extent that the sources cited are otherwise admissible, it seems to the Court that the issues and sources cited in Relator's brief would be appropriate subjects for cross-examination of Rossiter. However, the Court holds that Rossiter is not obligated to adopt Relator's characterization of the LTC market and presume unbridled, illegal swapping. See Walker v. Gordon, 46 F. App'x 691, 695-96 (3d Cir. 2002) ("An expert is, nonetheless, permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that

opinion is for the jury.  It is also, as the District Court observed, a proper subject for cross-examination." (citing Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002))); see also Arconic Corp. v. Novelis Inc., No. 17-1434, 2023 WL 2403916, at *3 (W.D. Pa. Mar. 8, 2023) (permitting a damages expert to assume that an antitrust violation was committed); E.E.O.C. v. FAPS, Inc., No. 10-3095, 2014 WL 4798802, at *7 (D.N.J. Sept. 26, 2014) (finding that a challenge to an expert based on facts not considered "relate[d] to questions of credibility or weight, not to the issue of admissibility." (citing Walker, 46 F. App'x at 695-96)). Excluding Rossiter's opinion would require characterizing the facts as presented by Relator, which the Court declines to do.

The Court rejects Relator's arguments concerning Rossiter's opinion as to Part A and Part D pricing for similar reasons.  In his report, Rossiter opines that the amount paid to PharMerica for Part A does not impact whether or how much is paid by the government for Part D or Medicaid.  (ECF 637-1 at ¶¶ 16, 108). This opinion is based on the separate payment systems for Part A and Part D and the lack of information on Part A payments and rates that reach the government, the fact that Part D payments are made to plan sponsors as opposed to LTC pharmacies, and that Part A and state-level Medicaid programs similarly operate across distinct and separate payment systems.  (Id. at ¶¶ 109-

13

114).

Relator responds that these opinions are contrary to law and therefore are unreliable and inadmissible. Relator's challenge does not address the separateness of Part A, Part D, and Medicaid payment systems, but rather asserts that Part D sponsors seeking direct payment from the government must agree to comply with federal laws and regulations and ensure such compliance from downstream entities and that PharMerica entered into contracts that contained certifications of such compliance. (ECF 637 at 19 (citing 42 CFR § 423.505(h)(1), (i)(3)(iv), (i)(4)(iv))). Claims that have violated the AKS are not payable under Part D, Relator notes, citing the Court's previous acknowledgement "that compliance with the AKS is a precondition to the payment of Medicare and Medicaid claims," (id. at 22-23 (quoting ECF 544 at 21)), and numerous courts in and outside the Third Circuit that have held that compliance with the AKS is a precondition of Medicare payment and therefore affects whether the government will reimburse, (id. at 26-30 (collecting cases)). Payment systems are thus intertwined, contrary to Rossiter's opinion, when an illegal kickback in one program is used to garner a referral for another. (Id. at 30).

Again, acceptance of Relator's argument requires the assumption that PharMerica violated the AKS in order to receive the right to service the SNFs' patients insured under Part D and

14

Medicaid.  Rossiter was not required to make that assumption, see Walker, 46 F. App'x at 695-96, and therefore was also not required to detail the effect violation of the AKS would have on government reimbursements.  To the extent that Relator contends that Rossiter's opinion is inaccurate or incomplete, the Court holds that cross-examination is the appropriate means to challenge as opposed to exclusion of the opinion.

**B. Relator's Motion to Exclude the Opinions of Hines (ECF 639)**

Relator next seeks to exclude from Hines's expert report aggregate, gross-margin data and related analyses concerning the performance of groups of SNFs along with a related exhibit. (ECF 640 at 6).  The relevant portions of Hines's report analyze the 174 SNFs in aggregate for the years 2007 through 2014 and state that the overall weighted gross margin for the SNFs was 17.2% over the period, with many individual homes also gross-margin positive and overall revenue exceeding costs in all but one quarter.  (ECF 640-3 at ¶¶ 12, 92-93).  Hines thereafter provides similar aggregate gross-margin data, rate-reset figures, and anecdotal information by three categories of SNFs: the seventeen facilities acquired through ChemRX's bankruptcy, the twenty-three facilities from Skilled Healthcare home group, and the remaining 134 homes – with additional discussion of subgroups within those categories.  (Id. at ¶¶ 98, 101-11). Exhibit A of the report provides per diem date ranges, rates,

15

number of rate resets, term length, and annual and aggregate gross-margin information for the 174 SNFs. (Id. at p. 15-18).

Relator contends that Hines's gross-margin analyses measuring profitability are flawed as they only consider the costs of the drugs themselves and not other, variable costs that would affect profitability such as those for labor and delivery. (ECF 640 at 7-8). Relator identifies multiple issues with Hines not including variable costs in his analyses, including courts' and OIG's recognition of analyses factoring in variable costs; PharMerica's own consideration of labor, debt, and other costs in profit-and-loss statements; Hines's acknowledgment of such costs; and Relator's contention that Hines's primary reason for using gross margin – that it is the primary accounting method used by PharMerica – is not justified when it is used in an allegedly unlawful scheme. (Id. at 16-22). Contribution-margin analyses, which account for variable costs and were utilized by Relator's expert – Shaked, are approvingly recognized in academic literature, according to Relator. (Id. at 8-12).

PharMerica counters that Relator's challenge is based on an asserted superiority of contribution margin, which it says is incorrect and not required. (ECF 667 at 10-11). PharMerica does not dispute that it accounted for costs beyond those of drug ingredients. (Id. at 17). However, it submits that such costs were not identified at the individual SNF level, but

16

rather the pharmacy level.  (Id. at 17-19).

The Court agrees with PharMerica that Relator's challenge boils down to the asserted superiority of Shaked's contribution-margin analyses versus Hines's gross-margin analyses.  Even if the Court were to agree with Relator that contribution margin is superior, "admissibility is not based on whether an expert's 'opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.'" UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 834 (3d Cir. 2020) (quoting Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017)).  For expert testimony to be reliable, and therefore admissible, it must be based on a reasonable method, not necessarily the best method available.  See Lentz v. Mason, 32 F. Supp. 2d 733, 746 (D.N.J. Jan. 11, 1999).

The administrative and out-of-circuit authorities cited by Relator do not compel a different result.  First, these authorities are not binding here.  See 42 C.F.R. § 1008.53 ("An advisory opinion issued by the OIG will have no application to any individual or entity that does not join in the request for the opinion."); Daubert v. NRA Grp., LLC, 861 F.3d 382, 395 (3d Cir. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge

17

in a different case." (alteration in original) (quoting Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011))).  Further, to the extent that the Court finds these authorities to be persuasive, they do not lead the Court to adopt Relator's reasoning.  OIG Advisory Opinion No. 99-2 merely states that discounts that are particularly suspect include those that are below supplier costs and that such costs should include total costs.  1999 WL 34984726, at *5, 5 n.12 (Feb. 26, 1999).  The district court in United States ex rel. McDonough v. Symphony Diagnostics Services., Inc. similarly recognized that OIG advisory opinions do not receive judicial deference, apply only to those who have requested the opinion, and that "OIG's identification of a practice as 'suspect' merely triggers further investigation by OIG; it does not render a practice per se illegal or unlawful . . . ."  36 F. Supp. 3d 773, 780 (S.D. Ohio Aug. 12, 2014). McDonough further rejected the relator's argument that "fully loaded costs," including variable and fixed expenses, were required under the AKS.  Id. at 776, 781.

The Court thus finds that Hines reasonably utilized an accepted method, the same method used by PharMerica in its business practices.  (Hines Dep. Tr. 148:1-19).  To the extent that Relator wishes to challenge Hines's analyses – as he does in his supporting and reply briefs – for not being inclusive of variable costs or that, despite Hines failing to factor in

18

variable costs, SNFs were nonetheless unprofitable during various years, cross-examination is the appropriate means of doing so.  When opposing experts "have applied a reliable methodology in reaching their conclusions, 'it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited.'"  In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig., 509 F. Supp. 3d 116, 192 (D.N.J. Apr. 27, 2020) (alteration in original) (quoting In re Asbestos Prods. Liab. Litig., 714 F. Supp. 2d 535, 547 (E.D. Pa. May 24, 2010)).

The Court also rejects Relator's challenge relating to Hines's aggregate figures.  Relator contends that, beyond being flawed for failure to account for costs beyond drug ingredients, presentation of aggregate gross-margin data is misleading "trickery" as it allows high margins in some years to smooth out negative margins in others.  (ECF 640 at 22-24; ECF 671 at 14-15).  The Court takes seriously the allegation that Hines's opinions may mislead the factfinder.  See Hartle v. FirstEnergy Generation Corp., Nos. 08-1019, 08-1025, 08-1030, 2014 WL 5474738, at *4 (W.D. Pa. Oct. 29, 2014) ("Proposed expert testimony that would mislead the jury or that does not speak clearly and directly to an issue in dispute in the case must be excluded." (citing Ford, 481 F.3d at 219 n.6 and Fed. R. Evid.

19

403)).  However, it notes that, though Hines presents aggregate data throughout his report, annual gross-margin figures are provided in Exhibit A, which Relator seeks to exclude.  (ECF 640-3 at p. 15-18).  This complete data, combined with Relator's ability to cross-examine Hines, leads the Court to conclude that the factfinder would not be misled by aggregate data.  See United States v. Graves, 465 F. Supp. 2d 450, 457 (E.D. Pa. Dec. 20, 2006) (concluding after a hearing that expert testimony concerning eyewitness reliability would not overwhelm or mislead the jury).

Finally, Relator argues that Hines errs in not including gross margins for 2005 and 2006, which he, citing his own expert, asserts were -48.1% and would have driven down PharMerica's aggregate figures.  (ECF 640 at 25-26).  Hines testified that cost data was not available for 2005 and 2006 as PharMerica was then a subsidiary of AmerisourceBergen and he chose not to speculate as to what 2005 and 2006 costs might have been.  (Hines Dep. Tr. at 172:12-21).  Relator does not dispute this deficiency in the data, but rather counters that his expert, Shaked, noted the same deficiencies in the data but nonetheless was able to produce estimates for 2005 and 2006.  (ECF 640 at 26).  The Court will not penalize Hines for declining to speculate on unavailable data.  See Telmanoski v. Bonefish Grill, LLC, No. 20-5466, 2022 WL 17324544, at *2

(D.N.J. Nov. 29, 2022) ("[E]xpert testimony that ignores existing data and is based on speculation is inadmissible." (quoting Yates Real Est., Inc. v. Plainfield Zoning Bd. of Adjustment, 404 F. Supp. 3d 889, 926 n.45 (D.N.J. July 31, 2019))).  The relative quality and sufficiency of Hines's opinions are best left to the jury.  See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig., 509 F. Supp. 3d at 192; see also Edmond v. Plainfield Bd. of Educ., No. 11-cv-2805, 2018 WL 4380991, at *4 (D.N.J. Sept. 13, 2018) ("Questions as to the sufficiency of an expert's factual basis are generally left to the jury." (quoting Brill v. Marandola, 540 F. Supp. 2d 563, 568 (E.D. Pa. Jan. 10, 2008))).

### C. PharMerica's Motion to Exclude the Opinions of Schafermeyer and Hoffman (ECF 641; ECF 642)

The Court will next evaluate PharMerica's motions to exclude opinions of Relator's experts Schafermeyer, (ECF 641), and Hoffman, (ECF 642), which – among other objections – assert that both experts offer impermissible legal opinions, (ECF 641-1; ECF 642-1).

District courts have discretion in admitting expert testimony that will aid the factfinder, but "must ensure that an expert does not testify as to the governing law of the case" and – though Federal Rule of Evidence 704 allows experts to embrace the ultimate issue – "an expert witness is prohibited from

rendering a legal opinion." _Berckeley Inv. Grp., Ltd. v. Colkitt_, 455 F.3d 195, 217 (3d Cir. 2006) (citing _United States v. Leo_, 941 F.2d 181, 195-96 (3d Cir. 1991)).  Permitting an expert to provide a legal opinion "usurp[s] the District Court's pivotal role in explaining the law to the jury." _Id._ (citing _First Nat'l State Bank v. Reliance Elec. Co._, 668 F.2d 725, 731 (3d Cir. 1981)).

Experts may, however, comment on industry customs and standards so long as they do not opine as to compliance with legal duties arising out of those customs and standards.  _See Mastripolito v. Jefferson Health-N.J._, 583 F. Supp. 3d 622, 626 (D.N.J. Feb. 2, 2022) (citing _Jordan v. Temple Health Sys., Inc._, No. 16-5561, 2018 WL 3649019, at *2 (E.D. Pa. Aug. 1, 2018)).  In other words, an expert opinion may indicate in the abstract whether certain actions are consistent with legal duties but may not instruct the factfinder which result to reach by stating whether certain actions did or did not violate a legal duty.  _See Krys_, 112 F. Supp. 3d at 193.

With these basic principles defined, the Court will consider the challenged opinions of Schafermeyer and Hoffman.

### 1. Schafermeyer

PharMerica asserts that Schafermeyer was retained to respond to its April 2020 motion for judgment on the pleadings and a May 2019 legal memorandum and seeks to exclude a

22

background section of Schafermeyer's report as well as five opinions that it claims are impermissible legal opinions. (ECF 641-1 at 2-3).

The background section referenced by PharMerica, Section E of Schafermeyer's report, provides background information on the AKS, including OIG Advisory Opinion No. 99-2. (ECF 641-2 at ¶¶ 61-66). Schafermeyer's opinions state that (1) PharMerica's position that false claims were not presented to an officer or employee of the government is disingenuous and inconsistent with a variety of authorities, (id. at ¶¶ 67-75), (2) PharMerica's position that Prescription Drug Event ("PDE") data are not claims under the FCA is inaccurate, (id. at ¶¶ 76-84), (3) PharMerica is incorrect in asserting that alleged kickbacks would not cause harm to the government, (id. at ¶¶ 85-97), (4) PharMerica is wrong to claim that low per diem rates charged for Part A residents would lead to lower costs, (id. at ¶¶ 98-102), and (5) violations of the AKS via an alleged swapping scheme would render PharMerica's prescription claims non-reimbursable, (id. at 103-06).

Relator asserts in his opposition that Schafermeyer's report provides background in the complex environment within which PharMerica operated. (ECF 663 at 7-10). The line between admissible and inadmissible opinions in such cases is often blurred, see Berckeley Inv. Grp., Ltd., 455 F.3d at 218, and

23

here is no exception.  The Court finds, as will be discussed below, that some – but not all – of the challenged portions of the report are inadmissible and will identify specific exclusions below.

The Court begins with Section E of the report, which provides background on the AKS.  Section E includes brief explanations of the AKS and "safe harbor" regulatory exceptions, (ECF 641-2 at ¶¶ 61-62), followed by a discussion and quotation of OIG Advisory Opinion No. 99-2 including Schafermeyer's opinion that "[o]ne of the examples of commercially unreasonable discounts described in the Advisory Opinion mirrors the allegations in this case."  (Id. at ¶ 63).  Section E continues with additional discussion of additional OIG guidance followed by assertions that the fourth amended complaint is consistent with his understanding of kickback prohibitions and an explanation as to why kickbacks are prohibited.  (Id. at ¶¶ 64-66).  To the extent that Section E commentates on what the AKS prohibits, explains safe harbor, or discusses OIG opinions and guidance, the Court agrees with PharMerica that Schafermeyer encroaches on the Court's duty to explain the law to the jury.  See Wood v. Showers, 822 F. App'x 122, 124 (3d Cir. 2020) ("It is the province of a judge – not an expert witness – to instruct a jury about governing law." (citing Berckeley Inv. Grp., Ltd., 455 F.3d at 217)).

Though Relator counters that Section E merely provides background information, (ECF 663 at 17), the Court notes that Schafermeyer relies on Relator's complaint to define the AKS and safe harbor provisions (which, in turn, cited relevant authorities) and attempts to draw parallels between this case and an OIG advisory opinion that is not binding on the parties. See 42 C.F.R. § 1008.53. To avoid indirectly permitting Relator to explain the law to the factfinder and the inclusion of potentially inapplicable regulatory standards, the Court will exclude these portions of Section E.

Moving to Schafermeyer's first opinion, the report summarizes PharMerica arguments that false claims were not presented to an officer or employee of the government, but rather a plan sponsor or pharmacy benefit manager. (ECF 641-2 at ¶ 67). It goes on to explain that plan sponsors, subcontractors, and downstream entities are required to certify compliance with applicable laws and regulations and – citing PharMerica's revised responses to Relator's second set of requests for admissions – that PharMerica agreements contained provisions relating to legal and regulatory compliance and certifications as to the accuracy and completeness of claims data and that it made all certifications and acknowledgements as required by its agreements. (Id. at ¶¶ 68-72). The opinion concludes with Schafermeyer asserting that "PharMerica's

participation in the alleged swapping scheme would, therefore, cause false Pa[r]t D claims to be submitted to and paid by the government" and that, based on his knowledge, experience, and review of the record, the involvement of intermediaries did "not negate the fact that PharMerica provided services to Medicare and Medicaid patients, caused claims to be presented to the Government, and received reimbursement of governmental funds on claims that Relator alleges were tainted by illegal kickbacks." (Id. at ¶¶ 73, 75). These opinions, in the Court's view, walk the line between the example provided in Krys, in which testimony about whether actions would be inconsistent with legal duties were permissible in the abstract, but opinions as to whether a duty was indeed violated would be impermissible. 112 F. Supp. 3d at 193. It will therefore permit the argument summary and discussion of agreement language and certifications but disallow the application to PharMerica's actions.[2]

Second, Schafermeyer summarizes PharMerica's position that PDE data are summary records and not claims for the purposes of the FCA, (ECF 641-2 at ¶¶ 76-77), and describes claim and

---

[2] Further, as noted by PharMerica, (ECF 641-1 at 8), the Court has previously "reject[ed] PharMerica's argument that Relator's pre-FERA claims under Count II and the related ones under Count III must be deemed futile for supposed failure to allege PharMerica 'ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government' as opposed to by a private entity . . . ," (ECF 544 at 25 (second, third, and fourth alterations in original)).

reimbursement processes, (id. at ¶¶ 78-79).  The opinion then recites the Department of Justice's position contrary to PharMerica's and the government's statement of interest in response to PharMerica's opposition to the motion for leave to file the fourth amended complaint and reviews an earlier opinion in this case[3] and two out-of-district opinions before concluding that PharMerica's position should be rejected.  (Id. at ¶¶ 80-84).  The Court will exclude these portions of Schafermeyer's opinion to the extent that they recite or review caselaw.  See Mastripolito, 583 F. Supp. 3d at 627; see also Barnes v. Shell Expl. and Prod. Co. Appalachia, No. 4:18-CV-01497, 2021 WL 2106354, at *2 (M.D. Pa. May 25, 2021) (excluding an expert's summary of caselaw).

Third, Schafermeyer summarizes PharMerica's argument that, in the event that it was overpaid, Centers for Medicare and Medicaid Services ("CMS") was not damaged and rejects that position by asserting that the majority of federal payments for Part D are impacted by the number and cost of prescription claims and, though Part D is paid – in part – prospectively, it may be reconciled based on actual expenditures and thus CMS would be harmed by paying for fraudulent or otherwise non-

---

[3] PharMerica, in its brief accompanying its motion, also notes that the Court has already held that "PDEs are claims for payment on which FCA liability may be based."  (ECF 641-1 at 9 (citing ECF 544 at 18-19)).

reimbursable prescriptions. (ECF 641-2 at ¶¶ 85-93).
Schafermeyer adds that even when payments are not reconciled to
an exact amount, a plan's future bids are based on the actual
expenditures of prior years and that, if CMS were to detect
erroneous prescriptions, it would be able to demand adjustments
for those claims and OIG could exclude the pharmacy from future
participation in federal healthcare programs. (Id. at ¶¶ 95-
97). The Court disagrees with PharMerica that this portion of
the expert report drifts into legal opinions and, though
PharMerica further argues that Schafermeyer speculates as to
what CMS and OIG might have done, (ECF 641-1 at 10-11), the
Court further disagrees that identifying potential courses of
conduct would confuse the jury.

Fourth, the report, citing a memorandum from PharMerica to
the United States Attorney's Office, recites PharMerica's
position that lower Part A per diem rates lower drug
expenditures consistent with public policy and congressional
intent and that such rates would not impact Part D pricing.
(ECF 641-2 at ¶¶ 98-99). Schafermeyer – citing the high
concentration within the LTC pharmacy industry – opines to the
contrary, that a swapping scheme would likely increase
healthcare costs or decrease the quality of medical services
and, while costs may decrease for individual SNFs, low per diem
rates provided for the purpose of capturing more lucrative Part

D and Medicaid patients would result in unfair advantage and "crowd out potential competition." (Id. at ¶¶ 100-101). The Court, again, disagrees that Schafermeyer offers legal opinion here and, to the extent that PharMerica further contends that Schafermeyer "has not done any research on the competitive nature of the [LTC pharmacy] industry," (ECF 641-1 at 12), the Court will not exclude the opinion on this basis. Schafermeyer testified that he did not personally conduct research on the impacts of swapping, but rather based his opinion on literature. (Schafermeyer Dep. Tr. at 141:5-11). Given Schafermeyer's expertise in pharmacy administration, (ECF 641-2 at ¶¶ 1-7), the Court is satisfied that his knowledge and experience meets the liberal standard of exceeding that of the average layman. See Krys, 112 F. Supp. 3d at 193-95.

Finally, Schafermeyer submits that violation of the AKS would render claims non-reimbursable and cites PharMerica's memo to the United States Attorney's office – which itself cited an out-of-district case relating to damages. (ECF 641-2 at ¶¶ 103-105). He concludes by stating:

> [I]t is my understanding that if plan sponsors had known that claims were tainted by PharMerica's violation of the AKS, they would not be able to reimburse these claims. However, there is no evidence that either the plan sponsors or their PBMs were aware of the alleged kickback scheme. Instead, they relied on PharMerica to submit accurate claims and to comply with all Federal and state laws, regulations and guidance pertaining to participation in Medicare and

29

Medicaid, including the AKS.

(Id. ¶ at 106).

For the same reasons stated above, the Court will exclude this opinion as it, albeit indirectly, instructs on caselaw and ventures toward applying PharMerica's actual alleged actions to its identified legal duties.  See Mastripolito, 583 F. Supp. 3d at 627; Rock, 683 F. Supp. 2d at 329.

To the extent that the Court has not excluded Schafermeyer's opinions above, it will not do so for the additional reasons offered by PharMerica, namely that he is not qualified to provide his opinions, (ECF 641-1 at 13-15), his methodology is unreliable, (id. at 15-17), or that his opinions will otherwise confuse or mislead the factfinder, (id. at 17-19).

Schafermeyer, among other qualifications, holds master's and doctorate degrees in pharmacy administration, has taught master-level courses "dealing with financial management and healthcare policy issues such Medicare, Medicaid, managed care organizations, and pharmacy benefit managers," and has authored textbook chapters concerning financial and economic issues relating to Medicare and Medicaid.  (ECF 641-2 at ¶¶ 1, 3, 5). "[A]n expert cannot be excluded because the trial court does not deem the proposed expert to be the most qualified or because the proposed expert does not have the specialization the Court

30

considers to be the most appropriate," <u>Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.</u>, 546 F. Supp. 2d 155, 167 (D.N.J. Feb. 5, 2008), but rather – when an expert meets the liberal standard for qualification – "the level of the expert's expertise goes to credibility and weight, not admissibility," <u>id.</u> (quoting <u>Kannankeril v. Terminix Int'l Inc.</u>, 128 F.3d 802, 809 (3d Cir. 1997)).

Further, PharMerica's concerns as to confusion and misleading appear to be focused on Schafermeyer's citation to OIG Advisory Opinion No. 99-2. As the Court has excluded that portion of the report above, the Court will consider PharMerica's concerns addressed.

### 2. Hoffman

PharMerica also seeks to exclude opinions of Hoffman, a professor at University of Pennsylvania Carey Law School retained to rebut Rossiter's report and opinions, (ECF 642-4 at ¶¶ 1-3), on the basis that they are improper legal opinions, include misleading or unduly prejudicial discussions, and do not constitute proper rebuttal, (ECF 642-1). The Court agrees in part.

At the outset, the Court will reject PharMerica's alternative argument that Hoffman's report constitutes improper rebuttal – an argument based in significant part on deposition testimony in which Hoffman did not wholly disagree with

31

Rossiter's opinions and PharMerica's stance that Hoffman's report does not "respond to the core" of others. (ECF 642-1 at 17-19). The Court, in exercising its discretion, concludes that Hoffman's report sufficiently explains, repels, counteracts, or disproves the opinion of Rossiter. See Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. Mar. 16, 2004) (citing United States v. Chrzanowski, 502 F.2d 573, 576 (3d Cir. 1974)).

Moving to Opinion A of Hoffman's report, Hoffman first interprets Rossiter's report to suggest that, because of insufficient payment for patient care by Part A, SNFs demand – and pharmacies have no choice but to agree to – very low per diem pricing for Part A patients. (ECF 642-4 at ¶ 10). Hoffman goes on to opine that, though prospective payment creates an incentive for SNFs to operate efficiently, "it was not intended that the PPS would require parties to violate the law." (Id. at ¶ 12). Opinion A states that when Medicare was enacted in 1965 it did not set reimbursement rates – resulting in reimbursements outpacing enrollees, includes a brief history of congressional considerations and actions intended to address costs and the implementation of prospective payment, and opines that prospective payment was not intended to invalidate the AKS or force parties into offering services below cost but – to the contrary – the AKS has been bolstered over the years to include harsher penalties. (Id. at ¶¶ 13-18).

PharMerica argues that Opinion A is a veiled attempt to present legal arguments, does not directly rebut Rossiter's opinions, and includes improper opinions such as what constitutes an AKS violation.  (ECF 642-1 at 5-7).  The Court disagrees.  Qualified experts may provide background on a statutory or regulatory scheme so long as their opinions do not state whether the statute or regulation was violated.  See Hartle v. FirstEnergy Generation Corp., Nos. 08-1019, 08-1025, 08-1030, 2014 WL 1117930, at *3, 5-6 (W.D. Pa. Mar. 20, 2014) see also United States v. Onyenso, 615 F. App'x 734, 738 (3d Cir. 2015) ("Informing the jury about the purpose of a statute is permissible, although in some cases that purpose can be irrelevant and unduly prejudicial.").  The Court concludes that Opinion A provides background information that may prove useful to the factfinder and does not usurp the role of the Court or the factfinder by setting forth applicable legal standards or opining on whether a legal duty was or was not breached.  The Court will therefore deny PharMerica's motion as to Opinion A.

Opinion B requires a different result.  In Opinion B, Hoffman summarizes her interpretation of Rossiter's opinion of the competitiveness of the LTC market, (ECF 642-4 at ¶ 18), before discussing the AKS including its history, what it prohibits, penalties for violation, quotations from OIG's website stating that "in the Federal health care programs,

33

paying for referrals is a crime," and statutory text from the 2010 amendment of the AKS, (id. at ¶¶ 19-26).  The Court finds that these opinions encroach on the Court's role of explaining the law and will therefore exclude them.  See Wood, 822 F. App'x at 124.

Opinion B next defines swapping and opines that "it implicates the AKS," (ECF 642-4 at ¶ 27), and cites several OIG advisory opinions and other sources in support of the proposition that OIG has cautioned market participants against swapping, (id. at ¶ 28).  Hoffman then states that Shaked's report concerning PharMerica's profitability suggests "that PharMerica took losses on Medicare Part A business while it received something of greater value in return" and that "[t]hese arrangements suggest swapping of below-cost rates to SNFs for Medicare Part A business in return for referrals of more profitable Medicare Part D and Medicaid business."  (Id. at ¶¶ 29-30).  Hoffman further opines that an example of a successful PharMerica bid that fell within the middle range of other pharmacies' bids did not indicate legality as all bids may have represented illegal kickbacks and, citing Gale and a 2013 Omnicare settlement, that "PharMerica's matching of Omnicare's bid (which PharMerica determined was 'significantly below cost') could suggest that, indeed, PharMerica was in violation of the AKS."  (Id. at ¶ 31).

34

The Court maintains the same concerns regarding discussions of OIG advisory opinions and guidance as detailed above, namely the limited applicability of OIG advisory opinions and the usurpation of the Court's role in explaining the law. Furthermore, though couched in terms such as "suggest," the Court holds that these opinions invade the province of the factfinder in determining whether PharMerica violated the AKS. See Berckeley Inv. Grp., Ltd., 455 F.3d at 217; Krys, 112 F. Supp. 3d at 193. These opinions will therefore be excluded.

The remainder of Opinion B raises separate concerns. Hoffman cites PharMerica's February 2010 letter requesting an OIG opinion as "acknowledge[ment of] its participation in swapping arrangements," (ECF 642-4 at ¶ 32), cites four settlements stemming from alleged swapping schemes including that of "Omnicare, PharMerica's largest competitor," (id. at ¶ 33), and references PharMerica's 2005 settlement and related five-year corporate integrity agreement resulting from an alleged kickback arrangement, (id. at ¶ 35).

Relator contends that these references are highly probative of PharMerica's knowledge of, among other things, the AKS and how OIG and DOJ handled suspected violations. (ECF 666 at 25-30). However, expert opinion as to a defendant's state of mind or knowledge is improper. See O'Bryant v. Johnson & Johnson, No. 20-2361, 2022 WL 7670296, at *12 (D.N.J. Oct. 13, 2022).

Further, even if the Court were to permit such opinions from an expert – which it will not – it concludes that whatever probative value these references offer is substantially outweighed by the risk of unfair prejudice and misleading the jury.  Evidence of settlements may be excluded under Federal Rule of Evidence 403.  See Trout v. Milton S. Hershey Med. Ctr., 572 F. Supp. 2d 591, 600 (M.D. Pa. Aug. 27, 2008) (finding that plaintiffs' settlement with a separate tortfeasor was excludable pursuant to Federal Rule of Evidence 403 in a medical malpractice action).

The Court finds that the risk of unfair prejudice is particularly high – while the relative probative value is comparatively low – with respect to the settlement agreements because the alleged swapping schemes did not involve PharMerica and PharMerica's 2005 settlement related to different behavior – alleged payment of an "excessive amount of money" to purchase a small pharmacy in exchange for referral of Medicaid and Medicare business.  See OIG Settles Largest Ever Kickback Civil Monetary Action Against Pharmerica, U.S. Dep't of Health and Hum. Servs. – Off. of the Inspector Gen. (Mar. 29, 2005), https://oig.hhs.gov/newsroom/news-releases-articles/oig-settles-largest-ever-kickback-civil-monetary-action-against-pharmerica/. Additionally, the Court finds that the risk of unfair prejudice and confusion is sufficiently high as compared to the probative

value with respect to Hoffman's reference to PharMerica's February 2010 letter to OIG.  Among the Court's concerns is the fact that, contrary to what Hoffman seems to indicate, (ECF 642-4 at ¶ 32), PharMerica's letter does not refer to its then-active practices, but rather a proposed arrangement, (ECF 637-4).

Finally, Opinion C of Hoffman's report rebuts Rossiter's above-stated opinion as to the separateness of Part A, Part D, and Medicaid by stating that "[t]he AKS does not require that an illegal kickback affects prices, but rather that referrals might not be solely made based on beneficiaries' best interests" and, citing OIG Advisory Opinion No. 99-2, that per diem discounts could impact government payment amounts by incentivizing the increase of Part D and Medicaid utilization to make up for Part A losses.  (ECF 642-4 at ¶¶ 39-40).  Hoffman discusses CMS reliance on Part D plan sponsors' certifications on behalf of themselves, subcontractors, and downstream entities to comply with relevant laws and retroactive investigation and enforcement when laws are nonetheless violated, indicating the seriousness of such violations.  (Id. at ¶¶ 43-46).  Lastly, Hoffman asserts that "PharMerica's false certifications directly caused CMS to pay amounts under Medicare Part D that were nonpayable, and CMS can recoup nonpayable amounts retroactively," and adds that pharmacies "define government liability under Part D" and may

affect government payment both through their submission of claims and the fact that claims in violation of the AKS are nonpayable and, if known, would reduce government liability. (Id. at ¶¶ 47-52).  The existence of private intermediaries between the government and pharmacies does not change the fact that services rendered in violation of the AKS are not payable, according to Hoffman, adding that "[i]f the Plan Sponsor had known that PharMerica's certifications were untrue, the Plan Sponsor should not have reimbursed PharMerica's claims." (Id. at ¶ 54).

As it has above, the Court will exclude the portions of Hoffman's report that state what is and is not a violation of the AKS.  See Berckeley Inv. Grp., Ltd., 455 F.3d at 217 (recognizing that it is courts' role to explain the law to the jury).  Further, while experts may base their opinions on a version of disputed facts, see Walker, 46 F. App'x at 695-96, the Court concludes that Hoffman's opinions indicating that PharMerica in fact made false certifications or otherwise violated the AKS impermissibly "stat[e] that [PharMerica] did indeed violate an applicable duty through certain actions" and therefore must be excluded.  See Krys, 112 F. Supp. 3d at 193.

### D. PharMerica's Motion to Exclude the Opinions of Shaked (ECF 656)

Last among the parties' Daubert motions, PharMerica moves

38

to exclude Shaked's opinions on, among other bases, poor fit, unreliability, and the improper proffering of legal opinions. (ECF 656; ECF 656-1).  The Court will address these challenges in turn below and ultimately grant the motion in part.

PharMerica first challenges Shaked's report on the basis of fit.  Shaked's report conducts contribution-margin analyses of PharMerica by which variable costs – expenses that vary with the quantity of products produced – are subtracted from sales.  (ECF 645 at ¶ 39).  PharMerica asserts that the question for the factfinder in this case is whether PharMerica violated the AKS by offering remuneration in exchange for the referral of other business and, citing Klaczak ex rel. United States v. Consolidated Medical Transport, 458 F. Supp. 2d 622, 678-79 (N.D. Ill. Sept. 30, 2006), contends that fair market value is the relevant benchmark.  (ECF 656-1 at 9-10).  There has been no showing that contribution margin is required or used internally to measure performance at the SNF level, according to PharMerica, and LTC400 data does not include rebates or delivery, labor, and other costs – so PharMerica has, instead, relied on gross margin to develop pricing and evaluate performance.  (Id. at 11-13).

"Fit" in the context of expert testimony is a question of relevance and ability to assist the factfinder with "a liberal policy of admissibility."  United States v. Schiff, 602 F.3d

152, 173 (3d Cir. 2010) (quoting <u>Kannankeril</u>, 128 F.3d at 806).

"The standard for fit is 'not that high' but 'is higher than

bare relevance.'" <u>McGarrigle v. Mercury Marine</u>, 838 F. Supp. 2d

282, 293 (D.N.J. Dec. 20, 2011) (quoting <u>In re Paoli R.R. Yard</u>

<u>PCB Litig.</u>, 35 F.3d 717, 745 (3d Cir. 1994)).  The Court finds

that Shaked's analyses "fit" under this liberal standard.

Though PharMerica seems to seek to narrow the means of

determining whether remuneration was offered by limiting fair

market value to an analysis of its competitors' pricing, the

Court is persuaded by <u>Gale</u> that PharMerica's own costs represent

a relevant factor to that end.  <u>See Gale</u>, 2013 WL 3822152, at *6

("Omnicare's Usual and Customary price would be evidence of the

fair market value, but so would the prices charged by Omnicare's

competitors.  Omnicare's costs would also bear on remuneration

because no rational market participant would intentionally lose

money on its Part A patients unless otherwise compensated.").

The Court therefore holds that Shaked's analyses will assist the

factfinder and thus sufficiently fit this case.

Shaked's analyses are next challenged based on reliability.

Shaked's opinions rely on the unsupported and untested

assumption that labor and delivery costs are variables

attributable to individual SNFs by month, according to

PharMerica, and ignore the differences among SNFs by allocating

costs and rebates proportionally based on the costs of drugs

dispensed.  (ECF 656-1 at 15-18).  Many of the calculations relied on are not actual data, as profit-and-loss statements were not available for nearly half of the pharmacy-month combinations relevant to the action, so figures were imputed from available data – including the use of 2007 average costs for completely unavailable 2005 and 2006 data.  (Id. at 18-19). In addition to these submitted shortcomings, PharMerica argues that Shaked's analyses are further made unreliable by multiple errors – including the use of amounts billed as opposed to revenue collected and an alternative Part A calculation that reduced a Part A billed-to-revenue ratio by the same percentage used by Relator's expert for Part D, contrary to actual practice.  (Id. at 20-24).  The Court will not exclude Shaked's opinions on these grounds.

The record indicates that at least one of these alleged errors – the use of billed amounts as opposed to revenue – was the same course used by PharMerica's expert, Hines.  (ECF 657-5 ¶ 88 n.123; Hines Dep. Tr. 143:8 to 144:6).  Further, to the extent that PharMerica challenges Shaked's calculations, errors themselves do not render expert opinions inadmissible, but rather go to the weight of the evidence and the expert's credibility.  See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig., 509 F. Supp. 3d at 144-46 (discussing an expert's "careless mistakes and shoddy record

keeping"). On review of Shaked's alleged errors, many of them identified through PharMerica's own expert, the Court concludes that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence." In re Urethane Antitrust Litig., 166 F. Supp. 3d 501, 504 (D.N.J. Jan. 25, 2016) (alteration omitted) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596 (1993)).

Important to the Court are Shaked's use of actual pharmacy data and explanation of his methods. PharMerica cites, in part, the Third Circuit's decision in ZF Meritor, LLC, to support its challenge of Shaked's imputation of available data and position that his calculations and related opinions must be excluded. The challenged expert in ZF Meritor, LLC relied on a one-page set of profit and volume projections to calculate damages, for which he was unaware of who exactly calculated the projections, the methodology used, and other information necessary for his effective cross-examination. 696 F.3d at 292-93. Here, however, Shaked explains how he used profit-and-loss statements of individual pharmacies to calculate monthly variable costs. (ECF 645 at ¶ 55 n.60; ECF 645-2 at ¶¶ 71-72). In this respect, the Court finds the instant dispute to be more akin to that considered within the District of Delaware in Insight Equity v.

<u>Transitions Optical, Inc.</u>, in which an expert's projection for future damages was based on a model used for business planning. <u>See</u> 252 F. Supp. 3d 382, 396 (D. Del. May 9, 2017).  The court distinguished <u>ZF Meritor, LLC</u> and admitted the expert's testimony because – unlike <u>ZF Meritor, LLC</u> – the information relied upon was more comprehensive and the expert was able to explain why he believed it to be reliable.   <u>Id.</u>

Though cognizant of its important "gatekeeping function," the Court is reminded that "[t]he standard for reliability is 'not that high.'"  <u>See Karlo</u>, 849 F.3d at 80-81 (quoting <u>In re TMI Litig.</u>, 193 F.3d 613, 665 (3d Cir. 1999)).  While the Court is unpersuaded by Relator's position that PharMerica's lack of available data itself necessitates acceptance of Shaked's opinions, (ECF 661 at 27), upon review of the alleged deficiencies in Shaked's analyses, the Court concludes that the most appropriate course is to permit the factfinder to weigh accuracy and credibility following presentation and cross-examination, not wholesale exclusion.

The Court will also decline to exclude Shaked's opinions relating to California's Low Price Rule, which prohibits charging Medi-Cal more for any service or article than would have been charged "to other purchasers of comparable services or articles under comparable circumstances."  <u>See</u> Cal. Code Regs., tit. 22, § 51501(a); <u>see also Physicians & Surgeons Lab'ys, Inc.</u>

v. Dep't of Health Servs., 8 Cal. Rptr. 2d 565, 571 (Cal. Ct.
App. 1992).  Shaked's report attempts to evaluate PharMerica's
alleged violation of the Low Price Rule by identifying the
seventy-three SNFs that had both Part A and Medi-Cal patients
serviced by PharMerica for at least a year and conducting a
series of analyses to determine whether PharMerica charged
higher prices for drugs to Medi-Cal patients than Part A
patients.  (ECF 645 ¶¶ 115-126).

PharMerica challenges this portion of Shaked's report,
citing Physicians & Surgeons Lab'ys, Inc., on the basis that
Shaked "did not try to determine PharMerica's 'usual fee to the
general public'" and that per diem arrangements and payment
under Medi-Cal are not "comparable circumstances."  (ECF 656-1
at 29-30).  The Court is persuaded by the discussion in United
States ex rel. Pasqua v. Kan-Di-Ki LLC, which appears to it to
be the most applicable case on point, in which the relators
"allege[d] that Defendant gave the SNFs steep discounts on the
services the SNFs paid for directly and, in exchange, the SNFs
provided Defendant with all of the SNFs' laboratory and x-ray
business for which Defendant could bill the government
directly."  See No. CV 10-965, 2012 WL 12895229, at *1 (C.D.
Cal. June 18, 2012).  The defendant, at the motion-to-dismiss
stage, argued that the relators failed to allege violation of
the Low Price Rule with sufficient particularity pursuant to

Federal Rule of Civil Procedure 9(b) because they had not alleged the usual sum charged to the public, that Medi-Cal was charged a higher rate, or that the services provided to SNFs were comparable to services provided under Medicare Part B and Medi-Cal. Id. at *7. The court denied dismissal on these grounds, holding that the defendant's "argument ignore[d] the allegations in Relators' Complaint that Defendant charged SNFs discounted rates for lab tests and x-rays that were not passed onto Medi-Cal or Medicare for the same services" and that the relators "sufficiently alleged that Defendant used dual pricing schedules for 'perform[ing] comparable services in comparable circumstances for both Medi-Cal and its provider-type clients,' and thus state[d] a claim under Regulation 51501." Id. (quoting Physicians & Surgeons Lab'ys, Inc., 8 Cal. Rptr. 2d at 576). The Court will therefore not exclude this portion of Shaked's report.

Additional challenges to Shaked's opinions include his review of evidence in the record, such as depositions, on which he did not rely on for his opinions; representation that the market was permeated by illegal swapping; statements regarding PharMerica's intent; and assertion of legal opinions. (ECF 656-1 at 24-27). The Court agrees that Shaked's proposal in his reply report that – if faced with the inability to maintain profitability with a SNF – PharMerica's options were to "(1)

45

exit the contract, (2) raise prices, or (3) maintain the status quo of selling at below-cost prices (<u>thus continuing the swapping</u>)," (ECF 645-2 at ¶ 40 (emphasis added)), should be excluded.  While Relator counters that Shaked's opinion was that of "an economist regarding the options of a company following normal business practices," (ECF 661 at 36), the statement that inaction in such a scenario would constitute illegal swapping invades the province of the factfinder.  See <u>Krys</u>, 112 F. Supp. 3d at 193.  As it did above, the Court will also prohibit references to unrelated settlements, the Lewin Group report, OIG advisory opinions and guidance, and PharMerica's February 2010 letter to OIG.

The Court further agrees that Shaked's summary of email exchanges, depositions, and other evidence not relied upon must be excluded.  Experts are not "permitted to simply summarize the facts and the depositions of others.  Such testimony comes 'dangerously close to usurping the jury's function' and 'implicates Rule 403 as a "needless presentation of cumulative evidence" and "a waste of time."'"  <u>Crowley</u>, 322 F. Supp. 2d at 553 (quoting <u>United States v. Dukagjini</u>, 326 F.3d 45, 54 (2d Cir. 2003)).  Relator explains that these recitations merely demonstrate a proper factual foundation for Shaked's opinions, (ECF 661 at 37-38), but this point is contradicted by Shaked's own statement that he "did not rely on any of the evidence [he]

46

reviewed" but rather such "evidence is consistent with and corroborative of [his] conclusions." (ECF 645 at ¶ 78). To the extent they have not otherwise been excluded, the Court also acknowledges that Shaked's reports include statements concerning PharMerica's knowledge, intent, and compliance with legal duties, including that a PharMerica goal described during a deposition "would be an example of swapping," an "email demonstrate[d] PharMerica's willingness to provide drugs to SNFs with per diem arrangements for their Medicare Part A patients which were below cost or at commercially unreasonable prices," and that an internal PowerPoint document "establishe[d] that PharMerica was fully aware of the law on swapping at the time that it offered below-cost pricing on homes' Price A business in order to obtain the homes' more profitable Medicare Part D and Medicaid business." (See, e.g., ECF 645 at ¶¶ 91, 96; ECF 645-2 at ¶ 147). These portions, too, must be excluded for impermissibly offering opinions as to PharMerica's culpability and state of mind. See Krys, 112 F. Supp. 3d at 203.[4]

**IV. Motion to Seal**

Related to the above-reviewed motions to exclude expert opinions, the parties jointly move to seal various exhibits

---

[4] PharMerica's motion to exclude Shaked's opinions expressly "replace[d] the initial filing on June 24, 2022 (ECF 644, 645, 646)." (ECF 656 at 2). The Court will therefore order that the original motion to exclude Shaked's opinions, (ECF 644), be denied as moot.

attached to their Daubert motions.  (ECF 675).  Motions to seal within this District are governed by Local Civil Rule 5.3.  See Medley v. Atl. Exposition Servs., Inc., 550 F. Supp. 3d 170, 203 (D.N.J. July 26, 2021).  Local Civil Rule 5.3 requires that motions to seal be made via a single, consolidated motion on behalf of all parties, L. Civ. R. 5.3(c)(1), and provide (a) the nature of the materials or proceeding at issue, (b) the private or public interests warranting the relief sought, (c) the clearly defined, serious injury that would result without relief, (d) an explanation as to why less restrictive alternatives are unavailable, (e) any prior orders sealing the same materials, and (f) the identity of any objector, L. Civ. R. 5.3(c)(3).

Moving parties may overcome the presumption in favor of public access only by a showing of "good cause" – that is "a particularized showing that disclosure will cause a 'clearly defined and serious injury'" – that materials should be protected.  See Medley, 550 F. Supp. 3d at 203-04 (quoting Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994)).

The parties' motion is accompanied by the certification of PharMerica's counsel, which identifies exhibits – filed pursuant to Magistrate Judge Joel Schneider's discovery confidentiality order, (ECF 154) – for which the parties either withdraw their sealing request or jointly move to seal, (ECF 675-1 at ¶¶ 3-4).

Counsel states that these exhibits contain trade secrets and other private information the disclosure of which would result in substantial financial and business-relationship harms.  (Id. at ¶¶ 5, 7-8).  The exhibits "do not contain non-confidential information that can be redacted in a way that would be meaningful to the public" and thus no less-restrictive alternative exists, according to counsel.  (Id. at ¶ 9).

The Court has reviewed the exhibits sought to be sealed, the majority of which consist of financial data and analyses, private communications, and apparent portions of internal presentations.  Similar information has been sealed within the District, see Sanofi-Aventis U.S. LLC v. Merck Sharp & Dohme Corp., No. 2:17-cv-05914, 2018 WL 10152220, at *2 (D.N.J. Nov. 13, 2018) (granting a motion to seal private communications with the Food and Drug Administration); Boehringer Ingelheim Pharma GMBH & Co. KG v. Mylan Pharms., Inc., No. 14-4727, 2015 WL 1816473, at *2 (D.N.J. Apr. 22, 2015) (sealing portions of a brief and declaration containing sales and revenue information), and the Court agrees with the parties that disclosure of such information would cause significant harm to PharMerica and no less-restrictive alternatives would be practical.  The parties' motion to seal is granted as to these exhibits.

The parties' motion will be denied, however, to the extent that they seek to seal expert reports, or excerpts thereof, in

full.  Counsel's certification submits that these reports contain confidential business information.  (ECF 675-1 at ¶ 4). However, unlike the accompanying exhibits that the Court concludes are appropriate for sealing – which are relatively short and contain little if any non-sensitive information, the expert reports sought to be sealed are – in some instances – hundreds of pages long and it is not apparent to the Court that they consist entirely of confidential business information or that no less-restrictive alternative to complete sealing exists. Further, some of the relevant content of the experts' opinions has necessarily been discussed within this Opinion.  See Janssen Prods., L.P. v. Lupin Ltd., No. 2:10-05954, 2014 WL 956086, at *3 (D.N.J. Mar. 12, 2014).

The Court will therefore deny the parties' motion to seal to the extent it seeks to seal expert reports in full, see Richardson v. City of Newark, No. 16-cv-265, 2019 WL 1795542, at *2 (D.N.J. Apr. 24, 2019) (conditionally denying a motion to seal portions of an expert report for failure to demonstrate that no less restrictive alternatives were available), and provide thirty days for the parties to file a new motion to seal those portions of the record, and only those portions of the record, for which an adequate justification can be proffered.

**V. Conclusion**

For the reasons stated above, Relator's motions to exclude,

(ECF 636; ECF 639), will be denied; PharMerica's motions to exclude, (ECF 641; ECF 642; ECF 656), will be granted in part; PharMerica's initial motion to exclude the opinions of Shaked, (ECF 644), will be denied as moot; and the parties' joint motion to seal, (ECF 675), will be granted in part and the parties will be provided thirty days to file a new motion to seal the expert reports in full or in part.

 An Order consistent with this Opinion will be entered.


Date:  March 31, 2023      s/ Noel L. Hillman
At Camden, New Jersey     NOEL L. HILLMAN, U.S.D.J.